

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

DEC 3 '2

CLERK, U.S. DIST. COURT
By _____
Deputy

----------------------------------------------------------

ORIX CAPITAL MARKETS, LLC

    Plaintiffs

v.

UBS WARBURG, INC.,
UBS WARBURG REAL ESTATE SECURITIES
INC., UBS PAINEWEBBER INC., AND
PAINEWEBBER MORTGAGE
ACCEPTANCE CORPORATION V,

    Defendants.

----------------------------------------------------------

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Civil Action No.: 3-02-CV-2212-K

## PLAINTIFF'S AMENDED COMPLAINT – CLASS ACTION

TO THE HONORABLE JUDGE OF THIS COURT:

    ORIX Capital Markets, LLC brings this action against Defendants UBS Warburg, Inc., UBS Warburg Real Estate Securities Inc. (f/k/a Paine Webber Real Estate Securities, Inc.), UBS PaineWebber Inc. (f/k/a PaineWebber Inc.), and PaineWebber Mortgage Acceptance Corporation V (collectively "Defendants") and pleads as follows:

### SUMMARY OF THE ACTION

1.    This case concerns Defendants' securities fraud made in connection with the sale of Certificates that constitute the beneficial ownership of a Trust administered by LaSalle Bank National Association for Certificateholders of PaineWebber Mortgage Acceptance Corporation V Commercial Mortgage Pass-Through Certificates Series 1999-C1 (the "Trust"), which Trust holds commercial mortgage loans acquired from Defendant Paine Webber Real Estate Securities, Inc.. The Trust is a Delaware trust evidenced by a June 1,

PLAINTIFF'S AMENDED COMPLAINT – page 1

1999 Pooling and Servicing Agreement. The holders of the Trust certificates are referred to as Certificateholders. Plaintiff brings this case as a Certificateholder, in its representative capacity as Special Servicer of the Trust, and also as a class action under Federal Rule of Civil Procedure 23. Plaintiff seeks rescission of its investment in Trust Certificates and other relief under the securities laws.

## **THE PARTIES**

2.     Plaintiff ORIX Capital Markets, LLC ("ORIX") (f/k/a BancOne Mortgage Capital Markets, LLC) is a Delaware limited liability company with its principal place of business at 1717 Main Street, 9th Floor, Dallas, Texas 75201.

3.     Defendants UBS Warburg Real Estate Securities Inc. (f/k/a Paine Webber Real Estate Securities, Inc. ("Paine Webber")), UBS Warburg, Inc., and UBS PaineWebber Inc. (on information and belief f/k/a PaineWebber Inc.) are Delaware corporations with their principal place of business at 1285 Avenue of the Americas, New York, New York 10019. They may be served with process by serving their registered agent Corporation Service Company (d/b/a CSC Lawyers Incorporating Service Co.), 800 Brazos, Austin, Texas 78701. On information and belief, among their business lines, the Defendants, and, at the time of the transactions detailed in this Complaint, Paine Webber and PaineWebber Inc., originate(d) loans and securitize(d) them. On or about November 3, 2000, the ultimate parent of PaineWebber Inc. and Paine Webber merged with UBS AG. On information and belief, through one or more subsequent transfers, some portion of the liability of Paine Webber and PaineWebber Inc. was retained by UBS Warburg, Inc., a subsidiary of UBS AG ("UBS Warburg").

4.      Defendant PaineWebber Mortgage Acceptance Corporation V ("PaineWebber Mortgage") is a Delaware corporation with its principal place of business at 1000 Harbor Blvd., Weehawken, New Jersey 07086. PaineWebber Mortgage may be served with process by serving its registered agent Corporation Service Company, 80 State Street, Albany, New York 12207-2543. On information and belief, PaineWebber Mortgage, among its current business lines (and at all times relevant to this Amended Complaint), originates and securitizes loans.

## VENUE AND JURISDICTION

5.      The Court has subject matter jurisdiction of this action pursuant to 15 U.S.C. § 77v, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

6.      Personal jurisdiction over the Defendants exists in this Court because Defendants do significant business in this state, including but not limited to their activities related to the transaction that forms the basis of this Amended Complaint.

7.      Venue is appropriate in this Court under 15 U.S.C. § 77v and 15 U.S.C. § 78aa because a substantial part of the events giving rise to the claims asserted in this Amended Complaint occurred in Dallas County, Texas. Specifically, Plaintiff ORIX purchased Trust Certificates in Dallas County, Texas, and has serviced the loan pool from Dallas County, Texas.

## BASIS FOR REPRESENTATIVE ACTION

8.      The Pooling and Servicing Agreement provides that ORIX as Master Servicer or Special Servicer may in its discretion undertake any such action that it may deem necessary or desirable with respect to the enforcement and/or protection of the interests of the

PLAINTIFF'S AMENDED COMPLAINT -- page 3

Certificateholders under the Pooling and Servicing Agreement.   *See* PSA § 6.03. Similarly, Paine Webber's Mortgage Loan Purchase Agreement acknowledges that the representations, warranties and agreements made by Paine Webber are made for the benefit of, and may be enforced by or on behalf of, the Trustee and the Certificateholders to the same extent that the Purchaser has rights against Paine Webber under the Mortgage Loan Purchase Agreement. *See* MLPA § 5.3.

### Class Action Allegations

9.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, which consists of all persons who purchased or otherwise acquired Certificates during the period beginning with the initial offering and continuing through September 3, 2002 (the "Class Period").   Excluded from the Class are: Defendants, members of the immediate family of Defendants, individual Defendants, former officers and directors of Defendants and any entity in which any Defendant has or had a controlling interest, and the legal representatives, heirs, successors, or assigns of any Defendant.

10.    Plaintiff does not know the full size of the Class, but on information and belief, the members of the Class are so numerous that joinder of all members is impracticable. Class Members are located nationwide.

11.    Plaintiff's claims are typical of the claims of the members of the Class in that the Plaintiff and each Class Member purchased or otherwise obtained Certificates during the Class Period pursuant to, and/or in reliance upon, a Prospectus and Prospectus Supplement issued as part of an integrated offering and containing common misrepresentations by the Defendants.   No corrective statements have been issued by any of the Defendants.

PLAINTIFF'S AMENDED COMPLAINT – page 4

12.    Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel competent and experienced in class action and securities litigation.

13.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy as joinder of all class members is impracticable.  Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation makes it impossible for the Class Members to seek redress individually for the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

14.    Common questions of law and fact exist as to all Class Members and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

    a.    whether federal securities laws were violated by the Defendants' acts and/or omissions;

    b.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts;

    c.    whether Defendants participated in and pursued a fraudulent scheme and the common course of conduct complained of herein;

    d.    whether Defendants acted willfully or recklessly in omitting to state and/or misrepresenting material facts;

    e.    whether Defendants' statements during the Class Period were recklessly made about the business, operations, finances, value, stock, and prospects of the Borrowers in the Loan Pool;

    f.    whether the price of the Certificates during the Class Period was artificially inflated due to non-disclosures and/or misrepresentations complained of herein; and

    g.    whether Plaintiff and other Class Members were damaged and, if so, the proper measures thereof.

## THE TRANSACTIONS

### The Confidential Offering Memorandum, Prospectus, and Prospectus Supplement

15.     In 1999, PaineWebber Mortgage, Paine Webber, and PaineWebber Inc. took steps to establish the Trust. The Trust would be established through a Pooling and Servicing Agreement, which would create a pool of loans for securitization. The loans for the pool would be purchased by PaineWebber Mortgage under Mortgage Loan Purchase Agreements with Paine Webber and Merrill Lynch Mortgage Capital, Inc. ("Merrill Lynch"). The Mortgage Loan Purchase Agreement with Paine Webber makes it abundantly clear that Paine Webber originated the loans it supplied to the loan pool for the express purpose of securitization. Interests in the pool of loans were to be offered simultaneously to public and private investors, all of whom would be provided with a prospectus and prospectus supplement.

16.     As part of this integrated offering, Defendants PaineWebber Inc. and PaineWebber Mortgage, along with Merrill Lynch, Pierce, Fenner & Smith Inc. and Merrill Lynch & Co. (Merrill Lynch, Pierce, Fenner & Smith Inc. and Merrill Lynch & Co. are collectively called "Merrill Lynch") prepared and, by instrumentalities of interstate commerce, disseminated in and around June 1999, a Prospectus dated March 25, 1999 (the "Prospectus") and a Prospectus Supplement to Prospectus dated June 1, 1999 ("Prospectus Supplement").

17.     Also in or around June 1999, as part of this integrated offering, Defendant PaineWebber Inc. and Merrill Lynch, by instrumentalities of interstate commerce, prepared and sent to Plaintiff ORIX and other potential purchasers a June 7, 1999 Confidential Offering

PLAINTIFF'S AMENDED COMPLAINT – page 6

Memorandum ("COM"), along with the Prospectus and Prospectus Supplement (collectively the "Offering Documents").

18.     On information and belief, Paine Webber participated in creating the Prospectus, Prospectus Supplement, and PPM by providing to PaineWebber Inc. specific information about the loans Paine Webber originated for the loan pool, including representations and warranties Paine Webber would make about the quality of loans in the pool and information about Paine Webber's process and standards in underwriting loans for the loan pool. Plaintiff forms this belief based upon the fact that Paine Webber originated or purchased the loans it sold to PaineWebber Mortgage and therefore was the only source of information about the origination process, its own underwriting standards, and the quality of the loans that it provided to the loan pool.

19.     Certain representations from Paine Webber included in the Prospectus and Prospectus Supplement derived from the Mortgage Loan Purchase Agreement entered into by Paine Webber. This agreement was incorporated in significant part into the Prospectus Supplement, and referenced in the Prospectus.

20.     The Offering Documents solicited ORIX and the other Class Members to purchase Certificates, which evidenced beneficial ownership in the Trust consisting primarily of a pool of 177 conventional, fixed-rate mortgage loans secured by 193 commercial and multifamily properties.

21.     Merrill Lynch, Pierce, Fenner & Smith Inc. and PaineWebber Inc. served as underwriters for the transaction. On information and belief, on or about June 1, 1999, Merrill Lynch, Pierce, Fenner & Smith Inc. and PaineWebber Inc. purchased Class A-1, Class A-2, Class X, Class B, Class C, and Class D Certificates and offered them for sale "by this

Prospectus Supplement." Pro. Supp. S-8. Likewise, on information and belief, on June 1, 1999, Merrill Lynch, Pierce, Fenner & Smith Inc. and PaineWebber Inc. purchased Class E, Class F, Class G, Class H, Class I, Class R, and Class LR Certificates and offered them for sale by the COM, although the COM noted that the "Prospectus and Prospectus Supplement contain discussions of risk factors, the characteristics of the Mortgage Loans, the characteristics of the Certificates and tax issues, among other things, that are relevant to an evaluation of the risks and rewards of an investment in the Offered Private Certificates." COM 2. The COM also advises purchasers to examine the Prospectus and Prospectus Supplement, and that in the case of any discrepancies the Prospectus Supplement would govern over the COM. COM 2. On information and belief, the Certificateholders purchased the Certificates from PaineWebber Inc. and Merrill Lynch, Pierce, Fenner & Smith Inc., paying over $616,668,000 for the Mortgage Pass-Through Certificates, Series 1999-C1, with Plaintiff ORIX purchasing from PaineWebber Inc. the classes of Mortgage Pass-Through Certificates, Series 1999-C1 set forth in the Certification of Named Plaintiff attached to this Complaint. Plaintiff forms these beliefs based on information provided in the COM, Prospectus, and Prospectus Supplement.

22. PaineWebber Mortgage, PaineWebber Inc., and Paine Webber each successfully solicited ORIX's and others' purchase of the Certificates, and were motivated at least in part by a desire to serve their own financial interests. Specifically, PaineWebber Inc. used instrumentalities of interstate commerce to send the COM, Prospectus, and Prospectus Supplement to actual and potential purchasers, stamped its name upon the COM, Prospectus, and Prospectus Supplement, and helped prepare the COM, Prospectus, and

Prospectus Supplement.  PaineWebber Inc. was motivated by potential profits from the sale of the Certificates and by a desire to sell the Certificates it owned as a result of the transaction.   Paine Webber helped prepare the COM, Prospectus, and Prospectus Supplement.  Paine Webber was motivated by a desire to assist PaineWebber Inc., its affiliate and the Certificate owner, in selling the Certificates.  Paine Webber was further motivated by a desire to retain its profit from the sale of its loans to PaineWebber Mortgage.  PaineWebber Mortgage stamped its name upon the COM, Prospectus, and Prospectus Supplement and helped prepare the COM, Prospectus, and Prospectus Supplement.  PaineWebber Mortgage was motivated by the desire to retain its profits from the sale of the Certificates to PaineWebber Inc. and Merrill Lynch, Pierce, Fenner & Smith Inc., and by a desire to assist PaineWebber Inc., its affiliate and the Certificate owner, in selling the Certificates.

### The Misrepresentations in Offering Materials

23.     In the COM, Prospectus, and Prospectus Supplement, PaineWebber Inc., Paine Webber, Merrill Lynch, and PaineWebber Mortgage represented that:

a.  "The Mortgage Loans sold to the Depositor by PWRES [Paine Webber Real Estate Securities Inc.] were generally underwritten in accordance with the underwriting criteria described under '- PWRES Underwriting Standards.'" Pro. Supp. at S-41.

b.  "Each Mortgaged Property sold to the Depositor was inspected by either (a) a member of PWRES' professional staff or by a direct agent PWRES, in the case of a Mortgage Loan sold by PWRES.  [...]  No inspection revealed any patent structural deficiency or any deferred maintenance considered material and adverse to the

interests of the holders of the Offered Certificates or for which adequate reserves have not been established." Pro. Supp. at S-66.

c. "Replacement reserves were calculated in accordance with the expected useful life of the components of the related Mortgaged Property [...] The useful life and cost of replacements were based upon estimates provided by professional engineers pursuant to building condition reports completed for each Mortgaged Property, subject to certain minimum underwritten replacement reserves which are described under the heading 'Escrow Requirements' set forth under 'PWRES' Underwriting Standards'." Pro. Supp. at S-65.

d. "All of the Mortgaged Properties were appraised in connection with the origination of the related Mortgage Loans. Each such appraisal was in compliance with the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute and/or the Uniform Standards of Professional Appraisal Practice as adopted by the Appraisal Standards Board of the Appraisal Foundation." Pro. Supp. at S-66.

e. "In connection with the origination of each Mortgage Loan, a professional engineer, licensed architect or qualified consultant inspected each related Mortgaged Property to assess the condition of the structure, exterior walls, roofing, interior structure and mechanical and electrical systems. The resulting reports indicated whether deferred maintenance items on certain Mortgaged Properties was required and it recommended certain capital improvements for which reserves were generally established at origination." Pro. Supp. at S-66.

f. "In underwriting a mortgage loan, PWRES examines borrower-provided property financial statements and rent rolls. Additionally, property operating history, industry

data regarding the local real estate market and an independent appraisal are reviewed." Pro. Supp. S-67.

g. "The Mortgage Loans originated by PWREI [PW Real Estate Investments Inc.] and such third-party originators and sold by PWRES to the Depositor were generally underwritten to PWRES guidelines as set forth below [...] In some instances, one or more provisions of the underwriting guidelines were waived or modified where it was determined by PWRES not to adversely affect such Mortgage Loans in any material respect." Pro. Supp. at S-67.

h. "In underwriting a mortgage loan, PWRES evaluates the borrower-provided property financial statements and rent rolls. Additionally, property operating history, industry data regarding the local real estate market and an independent appraisal are reviewed." Pro. Supp. at S-67.

i. "An engineering study and an environmental review are prepared by qualified consultants as described in '—Property Condition Assessments' above." Pro. Supp. S-68.

24. PaineWebber Inc., Paine Webber, Merrill Lynch, and PaineWebber Mortgage also represented that "Each Mortgage Loan Purchase and Sale Agreement shall obligate the related Mortgage Loan Seller to cure any breach of its representations and warranties (or a missing or defective document in the mortgage file) that materially and adversely affects the interests of the Trust in such Mortgage Loan." Pro. Supp. at S-71.

25. Indeed, the Depositor, PaineWebber Mortgage, attempted to emphasize its and the future Certificateholders' reliance on the representations and warranties of each Mortgage Loan Seller, including Paine Webber: "The Depositor makes no representations or warranties

with respect to the Mortgage Loans and will have no obligation to repurchase or substitute for defective Mortgage Loans. Each Mortgage Loan Seller is selling the Mortgage Loans sold by it without recourse, and, accordingly, will have no obligations with respect to the Certificates other than pursuant to the limited representations, warranties and covenants made by it to the Depositor and assigned by the Depositor to the Trustee for the benefit of the Certificateholders." Pro. Supp. at S-71. In this instance, however, PaineWebber Mortgage was in a position to assess the accuracy of the representations and warranties. The same individual who signed the Mortgage Loan Purchase Agreement on Paine Webber's behalf making the representations and warranties also signed on PaineWebber Mortgage's behalf

## Misrepresentations in the Mortgage Loan Purchase Agreement Incorporated into the Offering Materials

26.    Paine Webber transferred the loans to PaineWebber Mortgage (which transferred the loans to the Trust) under a June 1, 1999 Mortgage Loan Purchase Agreement.

27.    Under the Mortgage Loan Purchase Agreement, Paine Webber made representations and warranties about the characteristics of the loans transferred. Paine Webber agreed that these representations and warranties were for the Certificateholders' benefit, and that ORIX, as Servicer and as Special Servicer, could enforce the representations and warranties on the Certificateholders' behalf.

28.    Specifically, Paine Webber represented and warranted that:

    a.    "The Mortgage Loan Seller has not withheld any material information with respect to the Mortgage File;" *See* MLPA 3.2.(a)(v);

PLAINTIFF'S AMENDED COMPLAINT – page 12

b.  "The Mortgage Loan Seller has no knowledge that the material representations and warranties made by the Mortgagor in each Mortgage Loan are not true in any material respect." *See* MLPA 3.2.(b)(ii);

c.  "(A) Neither the Mortgage Loan Seller, nor, to the Mortgage Loan Seller's best knowledge, (1) any originator other than the Mortgage Loan Seller or (2) the Mortgagor, committed any fraudulent acts during the origination process of any Mortgage Loan, ... and (C) to the best of the Mortgage Loan Seller's knowledge, (1) the origination of each Mortgage Loan purchased by the Mortgage Loan Seller and (2) the servicing and collection of each Mortgage Loan is in all material respects legal, proper and prudent in accordance with customary industry standards utilized by prudent institutional and commercial mortgage lenders or loan servicers as appropriate." *See* MLPA 3.2(b)(iii);

d.  Immediately prior to the sale of the Mortgage Loan to the Depositor, the Mortgage Loan Seller had good and marketable title to and was the sole owner and holder of each Mortgage Loan, and the assignment validly transferred its ownership of the Mortgage Loan, free and clear of any and all liens, pledges and other encumbrances." *See* MLPA 3.2(b)(iv);

e.  "There is no material default, breach, violation or event of acceleration existing under the related Mortgage or Mortgage Note, and to the Mortgage Loan Seller's knowledge, there is no event ... which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute such a default, breach, violation or event of acceleration." *See* MLPA 3.2(b)(vi);

f.    "To the knowledge of [Paine Webber], as of the Closing Date, there is no pending action, suit or proceeding, arbitration or governmental investigation against a Mortgagor or Mortgaged Property, an adverse outcome of which would materially and adversely affect such Mortgagor's ability to perform under the related Mortgage Loan." *See* MLPA 3.2(b)(ix);

g.    "Each Mortage is a valid and enforceable first lien on the related Mortgage Property subject only to ... (B) covenants, conditions and restrictions, rights of way, easements and other matters of public record, none of which, individually or in the aggregate, materially interferes with the current use of the Mortgageed Property or the security intended to be provided by such Mortgage or with the related Mortgagor's ability to pay its obligations when they become due or the value of the Mortgaged Property." *See* MLPA 3.2(b)(xxiv);

h.    "The terms of each of the Mortgage Loan Documents comply in all material respects with all requirements of applicable local, state or federal law." *See* MLPA 3.2(b)(xxvi);

i.    "To [Paine Webber]'s knowledge, based upon a site inspection conducted in connection with the origination of the Mortgage Loan and a review of the related engineering report, each related Mortgage Property is free and clear of any material damage that would affect materially and adversely the value of such Mortgaged Property as security for the Mortgage Loan[.]" *See* MLPA 3.2(b)(xxxviii);

j.    "The improvements located on or forming part of each Mortgaged Property comply with applicable zoning and building laws, ordinances and regulations, or

PLAINTIFF'S AMENDED COMPLAINT – page 14

… if any such improvement does not so comply, such non-compliance does not materially and adversely affect the value of the related Mortgaged Property." *See* MLPA 3.2(b)(xli);

k.   "[T]he appraisal and appraiser both satisfy the requirements of the 'Uniform Standard of Professional Appraisal Practice' as adopted by the Appraisal Standards Board of the Appraisal Foundation, all as in effect on the date the Mortgage Loan was originated." *See* MLPA 3.2(b)(l);

l.   "With respect to each Mortgage Loan originated by a correspondent of the [Paine Webber] and purchased or 'table funded' by [Paine Webber] in connection with a correspondent relationship with such originator … (A) such Mortgage Loan was underwritten substantially in accordance with standards established by [Paine Webber], (which standards are in all material respects the same as the underwriting standards for Mortgage Loans originated by [Paine Webber]); … (C) the closing documents (which include assignment documents executed by the Mortgage Loan originator in favor of [Paine Webber]) for the Mortgage Loan were prepared in substantial compliance with forms approved by [Paine Webber] as the successor and assign to the Mortgage Loan originator." *See* MLPA 3.2(b)(lvi); and

m.   "Each Mortgage Loan originated by [Paine Webber] was underwritten consistent in all material respects with the standards of [Paine Webber] as then in effect and each Mortgage Loan purchased by [Paine Webber] from a third-party originator was underwritten consistent in all material respects with prudent commercial mortgage conduit lending standards." *See* MLPA 3.2(b)(lvii).

**THE REALITY: DOOMED LOANS -- DEFENDANTS'**
**MISREPRESENTATIONS, OMISSIONS, AND SUBSEQUENT COVER-UP**

29.    Defendants made material misrepresentations and omissions regarding the loans that Paine Webber sold to the Trust as a Mortgage Loan Seller.

30.    Consequently, compared to all loans in the Loan Pool, the Paine Webber loans have disproportionately defaulted or required special attention. In particular, the loans did not meet the standards represented in the COM, Prospectus Supplement, and the Mortgage Loan Purchase Agreement.

31.    These problems, and the subsequent investigation by ORIX as the Trust's Servicer and Special Servicer, demonstrate that Paine Webber:

a.    Did not perform underwriting conforming to the representations made in the COM, Prospectus Supplement, and the Mortgage Loan Purchase Agreement;

b.    Waived or modified underwriting guidelines that adversely affected loans in the Loan Pool in a material respect; and

c.    Failed to evaluate Borrowers and Borrowers' principals with respect to their financial capacity to meet obligations, credit history, and prior experience as owners and operators of commercial property.

32.    ORIX and the Certificateholders did not know of the untruths and omissions detailed in this Amended Complaint when they purchased the Certificates.

33.    Paine Webber failed to disclose that its practices in making the loans to be placed by it in the Trust and to be underwritten and offered to investors by its affiliate, PaineWebber Inc., did not conform to industry standards and, in fact, affirmatively misrepresented the quality of the loans that it deposited in the Trust. These affirmative misrepresentations: (1) were made by Paine Webber in the MLPA for the purpose of inducing the Trust to

PLAINTIFF'S AMENDED COMPLAINT – page 16

accept the loans and issue the Certificates and with the intent to induce Certificateholders to purchase the Certificates; (2) were incorporated by Paine Webber's affiliates, PaineWebber Inc. and PaineWebber Mortgage, in the Prospectus, Prospectus Supplement, and COM without modification or correction for the purpose of inducing investors to purchase Certificates, and (3) have not been corrected by the Defendants.

34.     Defendants concealed their fraud by failing to provide ORIX with relevant documents, even those documents ORIX needed to perform its duties as Servicer under the Pooling and Servicing Agreement.   Defendants failed to produce documents related to the underwriting of loan files as required by the Pooling and Servicing Agreement, which required Trustee LaSalle Bank, N.A. to file suit on March 28, 2002 against UBS Warburg Real Estate Securities ("UBS Warburg RES") to obtain such documents.

35.     That action, styled *LaSalle Bank, N.A. & ORIX Capital Markets, L.L.C. v. UBS Warburg Real Estate Securities, Inc.*, Case No. 02-02899 in the 134th District Court of Dallas County, Texas, was brought due to Paine Webber's willful failure to deliver to ORIX and LaSalle Bank documents related to the mortgage loans. On July 8, 2002, Paine Webber's successor, UBS Warburg RES, responded to ORIX's request for production and requests for admissions in the *LaSalle* case.  The request for production sought, among other things, "[a]ll copies of the origination files or documents related to the Mortgage Loans, in your possession, custody or control."  In responding to a Motion to Compel production of such documents, UBS Warburg RES represented to the Court that "UBSWRES had produced all non-privileged documents responsive to Orix's First Request for Production that UBSWRES was able to locate through a diligent search – totaling over 192,000

pages in this and a companion lawsuit brought by Orix with LaSalle Bank, N.A." The reference to the "companion lawsuit" is the *LaSalle* case described above.

36.    UBS Warburg RES further represented to the Court that "Plaintiffs' demand that 'UBS should be required to produce these document [sic] contained within an origination file to the extent they exist' was moot before it was filed", that "UBSWRES has already produced every non-privileged document responsive to these and ORIX's other requests that UBSWRES was able to locate after a diligent search", and that "despite the valid objections raised in the Response and Objections, UBSWRES withheld no documents from its production save privileged documents and a modest number of documents apparently subject to written confidentiality agreements or requests for confidential treatment." (emphasis added).

37.    Based on a preliminary analysis of the origination files produced by UBS Warburg RES, Paine Webber did not meet the represented guidelines for underwriting the loans. Such deficient document production can only be attributed to Defendants' failure to follow their stated underwriting standards or their improper failure to deliver to ORIX and the Trustee or to maintain such documents.

38.    The allegations in paragraphs 39 and 40 below, as well as those in paragraph 47, are made on information and belief, formed after review of these origination files.

39.    For example, a significant number of the files for the 141 borrowers in the loan pool lack financial statements, tax returns, organizational corporate documents, credit reports, public record checks, and/or verifications. Despite the lack of financial statements, tax returns, organizational documents, credit reports, public record checks, and/or verifications, Paine Webber, PaineWebber Inc. and PaineWebber Mortgage represented

that: "The borrower, and in the case of any Mortgage Loan secured by an indemnity deed of trust on a Mortgaged Property, the guarantor, under each of these Mortgage Loans is a single purpose entity." Pro. Supp. at S-62. *See also* MLPA 3.2(b)(x). Without obtaining such documents, however, Paine Webber could not have known that the borrowers were indeed single purpose entities, and, indeed, ORIX later discovered through litigation against individual borrowers that some of the borrowers were not single purpose entities.

40.　In addition, significant numbers of the files for the 141 properties in the loan pool lack rent rolls, operating statements, engineering reports, environmental reports, appraisals, evidence of another appraisal within 2 years of the loan, site inspection reports, and/or utility records. Despite this lack of rent rolls, operating statements, engineering reports, environmental reports, appraisals, evidence of another appraisal within 2 years of the loan, site inspection reports, and/or utility records:

a)　Paine Webber, PaineWebber Inc. and PaineWebber Mortgage represented that "…property operating history, industry data regarding the local real estate market and an independent appraisal are reviewed." Pro. Supp. at S-67. *See also* MLPA 3.2(b)(xvi). However, the absence of these documents from the loan origination files indicates that such information was not reviewed for significant numbers of the loans.

b)　Paine Webber, PaineWebber Inc. and PaineWebber Mortgage represented that: "In underwriting a mortgage loan, PWRES evaluates the borrower-provided property financial statements and rent rolls." Pro. Supp. at S-67. *See also* MLPA 3.2(b)(xvi). The significant absence of these documents demonstrates that in underwriting the mortgages, Paine Webber did not evaluate financial statements or rent rolls. Further,

Paine Webber, PaineWebber Inc. and PaineWebber Mortgage failed to disclose that significant numbers of origination files contain no such documents.

c) Paine Webber, PaineWebber Inc. and PaineWebber Mortgage also represented that: "each Mortgage Loan requires the related borrower to provide annual operating statements, rent rolls, and other information that the holder of the Mortgage Loan may reasonably request in connection with the related borrower and the related Mortgaged Property." Pro. Supp. at S-72. *See also* MLPA 3.2(b)(xvi). However, Paine Webber, PaineWebber Inc. and PaineWebber Mortgage failed to disclose that such information was not requested for significant numbers of loans in the pool.

d) PaineWebber, PaineWebber Inc. and PaineWebber Mortgage represented that: "Each Mortgaged Property sold to the Depositor was inspected by either (a) a member of the PWRES' professional staff or by a direct agent PWRES, in the case of a Mortgage Loan sold by PWRES, and (b), a member of the originator's professional staff or by a third-party professional retained for such purposes by the originator..." Pro. Supp. at S-66. The significant lack of inspection reports in the file demonstrates that significant numbers of properties in the pool were not inspected as represented.

e) Paine Webber, PaineWebber Inc. and PaineWebber Mortgage represented that: "In connection with the origination of each Mortgage Loan, a professional engineer, licensed architect or qualified consultant inspected each related Mortgaged Property to assess the condition of the structure, exterior walls, roofing, interior structure and mechanical and electrical systems. The resulting reports indicated whether deferred maintenance items on certain Mortgaged Properties was required and it recommended certain capital improvements for which reserves were generally established at

PLAINTIFF'S AMENDED COMPLAINT – page 20

origination." *Pro. Supp.* at S-66. *See also* MLPA 3.2(b)(xxxviii). The absence of these documents from the loan origination files indicates that significant numbers of the properties in the loan pool were not inspected as represented.

f) Paine Webber, PaineWebber Inc. and PaineWebber Mortgage represented that: "to the Mortgage Loan Seller's knowledge, based upon a site inspection conducted in connection with the origination of the Mortgage Loan and a review of the related engineering report, each related Mortgaged Property is free and clear of any material damage that would affect materially and adversely the value of such Mortgaged Property..." *Pro. Supp.* at S-73. *See also* MLPA 3.2(b)(xxxviii); MLPA 3.2(b)(1). Paine Webber, PaineWebber Inc. and PaineWebber Mortgage further represented that: "A 'Phase I' environmental site assessment was performed with respect to each Mortgaged Property in connection with the origination of the related Mortgage Loan and 'Phase II' environmental site assessments were performed with respect to certain Mortgaged Properties." *Pro. Supp.* at S-66. *See also* MLPA 3.2(b)(xlvi). Paine Webber, PaineWebber Inc. and PaineWebber Mortgage also represented that: "a Phase I Environmental Report and with respect to certain Mortgage Loans, a Phase II Environmental Report, was conducted by a reputable environmental engineer in connection with such Mortgage Loan, which did not indicate any material non-compliance or material existence of hazardous material or, if any material non-compliance or material existence of hazardous materials was indicated in any such report." *Pro. Supp.* at S-74. *See also* MLPA 3.2(b)(xlvi). The absence of architecture reports, engineering reports, and site assessments from the origination

PLAINTIFF'S AMENDED COMPLAINT – page 21

files, however, demonstrates that Paine Webber failed to inspect significant numbers of properties in the loan pool.

g) Paine Webber, PaineWebber Inc. and PaineWebber Mortgage represented that: "All of the Mortgaged Properties were appraised in connection with the origination of the related Mortgage Loans.  Each such appraisal was in compliance with the Code of Professional Ethics and Standards of Professional Practice as adopted by the Appraisal Standards Board of the Appraisal Foundation." Pro. Supp. at S-66.  *See also* MLPA 3.2(b)(*l*).  Paine Webber, PaineWebber Inc. and PaineWebber Mortgage also represented that: "the mortgage file contains an appraisal of the related Mortgaged Property which appraisal is signed by a qualified appraiser, who, to the best of the Mortgage Loan Seller's knowledge, had no interest, direct or indirect, in the Mortgaged Property or the borrower in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan, the appraisal and appraiser both satisfy the requirements of the 'Uniform Standards of Professional Appraisal Practice' as adopted by the Appraisal Standards Board of the Appraisal Foundation, all as in effect on the date the Mortgage Loan was originated." Pro. Supp. at S-75-76.  *See also* MLPA 3.2(b)(*l*).  The absence of appraisals from the origination files, however, demonstrates that significant numbers of mortgaged properties were not appraised as represented.

h) Paine Webber, PaineWebber Inc. and PaineWebber Mortgage represented that: "the Mortgage Loan Seller has inspected and caused to be inspected each related Mortgaged Property within the past twelve months." Pro. Supp. at S-74.  *See also* MLPA 3.2(b)(xliii).  The absence of inspection reports from the origination files,

PLAINTIFF'S AMENDED COMPLAINT – page 22

however, demonstrates that significant numbers of properties were not inspected as represented.

i) Paine Webber, PaineWebber Inc. and PaineWebber Mortgage represented that: "Replacement reserves were calculated in accordance with the expected useful life of the components of the related Mortgaged Property [...] The useful life and cost of replacements were based upon estimates provided by professional engineers pursuant to building condition reports completed for each Mortgaged Property, subject to certain minimum underwritten replacement reserves which are described under the heading 'Escrow Requirements' set forth under 'PWRES' Underwriting Standards'." Pro. Supp. at S-65. The absence of estimates and engineering reports in Paine Webber's loan origination files demonstrates that replacement reserves for significant numbers of loans were not calculated as represented.

41. The origination files, for individual loans involving millions of dollars, are nearly devoid of documentation and meaningful information. Numerous files leave issues open without any documentation that the issues were resolved before closing. Numerous files lack any information whatsoever on the property, borrower, or principals. In the rare instances that an origination file does contain meaningful documents, those documents indicate significant inconsistencies, inaccuracies, and efforts to conceal that the underwriting on the particular loan was not legal, proper, or prudent in accordance with customary industry standards utilized by prudent institutional and commercial mortgage lenders. By way of example and not limitation:

a) The origination file for PW4923 contains documents showing discrepancies between the identities of the borrower's stockholders.

b) The origination file for PW2550 contains an underwriter sign-off requiring line items for environmental holdback, equipment lease escrow, and bathroom repairs, but the closing statement does not reflect these items. The file also contains written notes requiring a $109,896 escrow for equipment leases, but the closing statement does not reflect that any such amount was withheld.

c) The origination file for PW4319 contains a memorandum recommending establishing a $25,000 escrow for past due taxes, but the closing statement does not reflect the recommended escrow.

d) The origination file for PW3714 contains documents showing inconsistencies on the identity of the borrower's general and limited partners.

e) The origination file for PW7134 contains numerous survey deficiencies, and indicates the Paine Webber inexplicably waived obtaining certified year-to-date property income and expense statements from the borrower. The rent rolls in the file contain no information regarding the terms of the leases or the security deposits.

f) The origination file for PW7133 indicates that Paine Webber waived obtaining certified year-to-date property income and expense statements from the borrower. The rent rolls in the file contain no information regarding the terms of the leases. A related origination file for PW7021 also contained rent rolls without information regarding the terms of the leases.

g) The origination file for PW4035 contains no tenant estoppels and subordination non-disturbance and attornment (SNDA) agreements for all but one tenant.

h) The origination file for PW4629 contains no tenant estoppels and subordination non-disturbance and attornment (SNDA) agreements.

PLAINTIFF'S AMENDED COMPLAINT – page 24

i)   The origination file for PW3825 contains evidence that the borrower is not a single purpose entity and a letter from an environmental consultant stating that the property is a large generator of hazardous waste.

j)   The origination file for PW4546 contains a completion/repair security agreement that lists required repairs in excess of the amount of the security deposit required to pay for the repairs.

k)   The origination file for PW2005 contains documents showing discrepancies over the borrower's owner, and the file did not contain any tenant estoppels or subordination non-disturbance and attornment (SNDA) agreements.

l)   The origination file for PW4817 contains underwriting analysis estimating ADA compliance at $750,000-$1,000,000, but the closing statement collects only $239,050 for this purpose. Furthermore, the file contains a notation that the borrower had a history of being difficult with other lenders, noting that "Borrower played serious hardball" with its previous lender by not making debt service payments for two months. The file did not contain any tenant estoppels or subordination non-disturbance and attornment (SNDA) agreements.

m)  The origination file for PW3441 shows the property's history of multiple violations for failure to maintain the elevator, for failure to obtain necessary permits for alterations to the property, and for using the property as a residential property.

n)   The origination file for PW4818 recommends a Phase II Environmental Report before closing, but the transaction closed prior to the receipt of the report.

o)   The origination file for PW6544 contains a deed of trust note for the property executed by a borrower on another loan.

PLAINTIFF'S AMENDED COMPLAINT – page 25

p) The origination file for PW3189 contains background searches showing numerous lawsuits and liens against the borrower's principals. A termite inspection revealed subterranean termites on the property, but Paine Webber did not require remediation or an escrow to address this issue.

q) The origination file for PW3615 contains a Completion/Repair Security Agreement missing its Exhibit B, which details the repairs to be performed under the agreement.

r) The origination file for PW1623 indicates that the borrower's insurance carrier did not meet the minimum rating.

s) The origination file for PW4112 shows that the amendment making the borrower a single purpose entity did not occur until four months after closing. Documents in the file indicate inconsistencies as to the identities of the borrower's principals.

t) The origination file for PW6414 shows that the borrower is a general partnership and therefore cannot be a single purpose entity. Paine Webber also allowed the borrower to have a non-market management agreement with a related party manager.

u) The origination file for PW3968 contains a commitment providing for a maximum 80% loan-to-value ratio. Based on the purchase price, the loan has an 83% loan-to-acquisition ratio.

v) The origination file for PW5947 provides for a 3% penalty on property taxes at closing and indicates that 18 of the 21 tenants lease month-to-month.

w) The origination file for PW4152 shows that the borrower also owns the property under loan PW4151 and thus is not a single purpose entity. An environmental assessment recommends an operations and maintenance plan for asbestos remediation, but no such plan was executed at closing.

PLAINTIFF'S AMENDED COMPLAINT – page 26

x) The origination file for PW4975 was a loan for the acquisition of a lease hold interest, and based on the lease price, had a loan to acquisition ration of 91%.

y) The origination file for PW4819 contains no credit reports, but the commitment indicates that one guarantor has two reported adverse judgments. The file did not contain any tenant estoppels or SNDA agreements.

z) The origination file for PW3397 contains no credit reports, but the commitment indicates that one guarantor has an adverse civil judgment. The documents show a discrepancy between the tenant estoppels and the rent rolls.

aa) The origination file for PW4149 shows discrepancies between rent rates and the tenant estoppels.

bb) The origination file for PW8190 is missing half the tenant estoppels, and the estoppels present in the file show discrepancies with the rent rolls.

cc) The origination file for PW6460 contains no rent rolls, tenant estoppels, or SNDA agreements.

42. Furthermore, the Prospectus and Prospectus Supplement gave the impression that the underwriting on the loans Paine Webber contributed to the loan pool was performed competently and professionally. PaineWebber Mortgage, Paine Webber, and PaineWebber Inc. failed to reveal that the underwriting on the Paine Webber loans was slipshod, incompetent, negligent, and undocumented in significant respects. The large volume of documents missing from the origination files demonstrates on information and belief that these were not mere oversights. ORIX's preliminary review demonstrates that not a single origination file for the loans that Paine Webber contributed to the loan pool contains all of the basic documents listed above. Indeed, several origination files contain

PLAINTIFF'S AMENDED COMPLAINT – page 27

almost none of the documents listed above, and at least half of the origination files lack half of the documents listed above.

43. The above omissions and misrepresentations were material because legal, proper, and prudent underwriting of mortgage loans in accordance with customary industry standards is the key to receiving a return on the Certificates. ORIX and the Certificateholders did not know of these omissions at the time that they purchased the Certificates. Had ORIX and the Certificateholders known the truth about Paine Webber's underwriting, they would not have purchased the Certificates.

44. Furthermore, in spite of the numerous failings, omissions, and inaccuracies listed above:

a) Paine Webber represented in the Prospectus Supplement that: "The Mortgage Loans sold to the Depositor by PWRES were generally underwritten in accordance with the underwriting criteria described under '-PWRES Underwriting Standards' below…" Pro. Supp. at S-41. In fact, the numerous issues listed above did not constitute origination and servicing that in all material respects was legal, proper and prudent in accordance with customary industry standards utilized by prudent institutional and commercial mortgage lenders or loan servicers.

b) Paine Webber represented in the Mortgage Loan Purchase Agreement that: "The Mortgage Loans originated by PWREI and such third-party originators and sold by PWRES to the Depositor were generally underwritten to PWRES guidelines as set forth below […] In some instances, one or more provisions of the underwriting guidelines were waived or modified where it was determined by PWRES not to adversely affect such Mortgage Loans in any material respect." Pro. Supp. at S-67. In fact, based upon the numerous issues listed above, the underwriting did not

constitute underwriting consistent in all material respects with prudent commercial mortgage conduit lending standards.

45.   Indeed, it was only through discovery initiated in actions brought on loans in default that ORIX has discovered documents demonstrating Defendants' fraud. Through subsequent litigation against other borrowers in default, both related to this loan pool and another Paine Webber loan pool in a Trust called Merrill Lynch Mortgage Investors, Inc. Mortgage Pass-Through Certificates Series 1999-C1, ORIX has discovered a pattern of Defendants making material misrepresentations and omissions concerning the loan pool. Plaintiff did not know, and in the exercise of reasonable diligence could not have known more than two years before the filing of this suit of Defendants' pattern and practice of failing to follow proper underwriting procedures and of misrepresenting the quality of the loans placed by Paine Webber in the Trust and of the falsity of the representations made by Paine Webber, PaineWebber Inc., and PaineWebber Mortgage in connection with the offer and sale of the securities.

46.   A significant interrelationship existed between PaineWebber Mortgage, Paine Webber, and PaineWebber Inc. Specifically, the Co-Head of PaineWebber Inc.'s Commercial Real Estate Division, responsible for the strategic and day-to-day management of PaineWebber Inc.'s CMBS trading and all debt and mezzanine lending activities, also served as Managing Director Commercial Real Estate of Paine Webber, and as president and director PaineWebber Mortgage. PaineWebber Inc.'s Managing Director of Conduit Programs also served as Managing Director Conduit for Paine Webber. The Managing Director of Conduit Programs was responsible for making commercial loans, and reported directly to the Co-Head. Furthermore, PaineWebber Inc.'s Managing Director

of Bond Structuring is not listed as an officer of Paine Webber by contemporary publications, but is Senior Vice President and Director of PaineWebber Mortgage. Despite not appearing as an officer of Paine Webber, this individual signed the Mortgage Loan Purchase Agreement on behalf of Paine Webber (as Mortgage Loan Seller) and on behalf of PaineWebber Mortgage (as Purchaser), listing his title as "Managing Director."

47. Defendants acted with the requisite mental state.

    a) PaineWebber Inc. acted with the requisite mental state.

        1) PaineWebber Inc. acted severely recklessly when it sold Certificates in private and public offerings. Specifically, the sale of Certificates involved an extreme departure from standards of ordinary care because of the significant interrelationship between PaineWebber Inc. and Paine Webber set forth above. Given this interrelationship, PaineWebber Inc. knew or should have known about Paine Webber's underwriting practices and procedures, Paine Webber's generation of the mortgage loans for the pool, and that the loans Paine Webber generated for the pool did not meet the quality standards represented in the Mortgage Loan Purchase Agreement, the COM, Prospectus, and Prospectus Supplement. Furthermore, PaineWebber Inc. incorporated the misrepresentations and omissions into the COM, Prospectus, and Prospectus Supplement, solicited purchases of the Certificates under the Prospectus and Prospectus Supplement, and placed its name upon the COM, Prospectus, and Prospectus Supplement. The shocking absence of documents from the loan origination files demonstrates a severe degree of recklessness regarding the representations and warranties that PaineWebber Inc. used to create the Prospectus and Prospectus Supplement and

solicit purchases of Certificates. Thus, PaineWebber Inc. knew (or it was so obvious that PaineWebber Inc. must have been aware of it) that it presented a danger of misleading buyers and sellers of Certificates by offering the Certificates through a COM, Prospectus, and Prospectus Supplement that contained fraudulent material misrepresentations and omissions that PaineWebber Inc. knew or should have known were fraudulent.

2) PaineWebber Inc. acted consciously by selling the Certificates to purchasers when PaineWebber Inc. knew that the representations made in the COM, Prospectus, and Prospectus Supplement were false or that they contained material omissions. Given the interrelationship between PaineWebber Inc. and Paine Webber, PaineWebber Inc. had to know that the mortgage loan origination files did not contain the most basic evidence of due diligence. Despite this knowledge, PaineWebber Inc. made no effort to correct or modify the representations and warranties in the Mortgage Loan Purchase Agreement, or the appearance of the representations and warranties as they appeared in the COM, Prospectus, and Prospectus Supplement. PaineWebber Inc. also made no effort to correct or modify the representations and warranties in soliciting the purchase of Certificates.

3) PaineWebber Inc. had the motive and opportunity to commit fraud. Its officer signed the Mortgage Loan Purchase Agreement on behalf of Paine Webber, even though on information and belief that individual was not an officer of Paine Webber. PaineWebber Inc. had the opportunity to correct the misrepresentations and omissions that were there and that were repeated in the COM, Prospectus, and

Prospectus Supplement. PaineWebber Inc. was motivated by the opportunity to make a profit for the sale of the Certificates and by a desire to sell the Certificates it owned as a result of the transaction.

b) PaineWebber Mortgage acted with the requisite mental state.

1) PaineWebber Mortgage. acted severely recklessly when it purchased the mortgage loans from Paine Webber and sold Certificates to PaineWebber Inc. for resale in private and public offerings. Specifically, the sale of Certificates involved an extreme departure from standards of ordinary care because of the significant interrelationship between PaineWebber Mortgage, PaineWebber Inc., and Paine Webber set forth above. Given this interrelationship, PaineWebber Mortgage knew or should have known about Paine Webber's underwriting practices and procedures, Paine Webber's generation of the mortgage loans for the pool, and that the loans Paine Webber generated for the pool did not meet the quality standards represented in the Mortgage Loan Purchase Agreement, the COM, Prospectus, and Prospectus Supplement. Furthermore, PaineWebber Mortgage incorporated the misrepresentations and omissions into the COM, Prospectus, and Prospectus Supplement, solicited purchases of the Certificates through the Prospectus and Prospectus Supplement, and placed its name upon the COM, Prospectus, and Prospectus Supplement. The shocking absence of documents from the loan origination files demonstrates a severe degree of recklessness regarding the representations and warranties that PaineWebber Mortgage used to create the Prospectus and Prospectus Supplement and solicit purchases of Certificates. It also demonstrates a severe degree of recklessness in PaineWebber

Mortgage's purchase of the mortgage loans from Paine Webber. Thus, PaineWebber Mortgage knew (or it was so obvious that Paine Webber must have been aware of it) that it presented a danger of misleading buyers and sellers of Certificates by offering the Certificates in a COM, Prospectus, and Prospectus Supplement that contained fraudulent material misrepresentations and omissions that PaineWebber Mortgage knew or should have known were fraudulent.

2) PaineWebber Mortgage acted consciously because the same individual bought and sold the mortgage loans to PaineWebber Mortgage. Thus, the individual signing for the truth of the representations and warranties regarding the loans also accepted the loans under the representations and warranties on PaineWebber Mortgage's behalf. If not conscious of the falsity of the representations and warranties, then PaineWebber Mortgage certainly acted with a severe degree of recklessness in not determining for itself the accuracy of the representations and warranties, particularly when the same individual signed on behalf of both entities. Furthermore, PaineWebber Mortgage subsequently sold the Certificates with the knowledge that the representations made in the COM, Prospectus, and Prospectus Supplement were false or that they contained material omissions. Given the interrelationship between PaineWebber Mortgage, PaineWebber Inc., and Paine Webber, PaineWebber Mortgage had to know that the mortgage loan origination files did not contain the most basic evidence of due diligence. Despite this knowledge, PaineWebber Mortgage made no effort to correct or modify the representations and warranties in the Mortgage Loan Purchase Agreement, or the appearance of the representations and warranties as they appeared in the COM,

Prospectus, and Prospectus Supplement. PaineWebber Mortgage also made no effort to correct or modify the representations and warranties in soliciting the purchase of Certificates through the COM, Prospectus, and Prospectus Supplement.

3) PaineWebber Mortgage had the motive and opportunity to commit fraud. Its officer signed the Mortgage Loan Purchase Agreement on behalf of Paine Webber, even though on information and belief that individual was not an officer of Paine Webber. By using the same individual to both purchase and sell the mortgage loans between entities, PaineWebber Mortgage shielded the transaction from additional scrutiny and thus had the opportunity to commit fraud. PaineWebber Mortgage also had the opportunity to correct the misrepresentations and omissions that were made in the Mortgage Loan Purchase Agreement and that were repeated in the COM, Prospectus, and Prospectus Supplement. PaineWebber Mortgage was motivated by the opportunity to make and retain a profit on the sale of the Certificates to PaineWebber Inc. and Merrill Lynch, Pierce, Fenner & Smith Inc., and also by a desire to assist its affiliate PaineWebber Inc. in selling the Certificates PaineWebber Inc. owned.

c) Paine Webber acted with the requisite mental state.

1) Paine Webber's actions were severely reckless because its misrepresentations and omissions in the Mortgage Loan Purchase Agreement involved an extreme departure from the standards of ordinary care. As demonstrated above, Paine Webber failed to perform on-site inspections, evaluate the payment and operational capabilities of providers, evaluate the financial performance of the

property, obtain independent appraisals, perform an engineering study and environmental review, and otherwise follow its basic underwriting standards, even though Paine Webber expressly represented in the Mortgage Loan Purchase Agreement that these guidelines were followed for each loan. These representations and omissions were carried over to the Certificateholders under the express language of the Mortgage Loan Purchase Agreement and the Mortgage Loan Purchase Agreement makes clear that the loans were originated for the express purpose of being sold to the Trust and securitized, and thus Paine Webber knew that it intended to induce buyers into purchasing securities, and thus there was the known or obvious danger of misleading buyers and sellers. Moreover, it was severely reckless for Paine Webber not to have known that its misrepresentations and omissions were being repeated in the COM, Prospectus, and Prospectus Supplement because of the interrelationship between the companies. It was further severely reckless for Paine Webber to allow an officer of an affiliated entity to sign the Mortgage Loan Purchase Agreement on its behalf.

2) Paine Webber was conscious of these misrepresentations because, as the originator of the loans, it was the creator of the loan files that did not contain the inspections or borrower evaluations that were represented to exist, and thus knew of the misrepresentations and omissions that were made as to each loan. Further evidencing Paine Webber's consciousness of its misrepresentations and omissions was its failure to produce loan documents under the Mortgage Loan Purchase Agreement until it was compelled to do so through litigation, which demonstrates

that it knew or should have known of its misrepresentations or omissions and attempted to conceal them. Further, as detailed above, on information and belief, Paine Webber participated in creating the Prospectus and Prospectus Supplement by providing Merrill Lynch Mortgage Investors Inc. with information about the loans it originated for the loan pool. This demonstrates that Paine Webber acted with knowledge that Certificates would be purchased based on misrepresentations and omissions it made in the MLPA that were carried over in the COM, Prospectus, and Prospectus Supplement.

3) Paine Webber had the motive and opportunity to commit fraud. It had the opportunity to correct the misrepresentations and omissions that were made to purchasers that were repeated in the COM, Prospectus, and Prospectus Supplement. Paine Webber was motivated by a desire to assist PaineWebber Inc., its affiliate and the Certificate owner, in selling the Certificates. Paine Webber was further motivated by a desire to profit from the sale of its loans to Merrill Lynch Mortgage Investors Inc.

48. By way of example of Paine Webber's faulty underwriting and origination processes, and not by limitation, PaineWebber Inc., PaineWebber Mortgage, and Paine Webber made material misrepresentations and omissions regarding loans made to Gateway Factory Outlet Center, L.P. and to P & D Investments, Inc.

## PAINE WEBBER'S LOAN TO GATEWAY FACTORY OUTLET CENTER, L.P.

### The Loan Underwriting

49. Gateway Factory Outlet Center Limited Partnership ("Gateway" or "Borrower") is a Washington limited partnership with its registered office in Bellevue, Washington.

50.    Ward Cook, Inc. ("Ward Cook") is an Oregon corporation with a principal office in Portland, Oregon.    Among its business lines, Ward Cook originates and securitizes commercial loans.

51.    On or about August 24, 1998, Ward Cook made a loan  in the original principal amount of $7,725,000 (the "Loan") to Gateway.  As evidence of the indebtedness resulting from the Loan, Gateway made, executed and delivered to Ward Cook a Deed of Trust Note (the "Note") in the original principal amount of $7,725,000.

52.    The Loan was secured by, *inter alia*, a Deed of Trust, Security Agreement and Assignment of Leases and Rents (the "Deed of Trust" or "Mortgage"), dated as of August 24, 1998.

53.    In or about August 1998, Ward Cook assigned the Note, the Deed of Trust and other loan documents to Paine Webber pursuant to an Assignment of Note, Deed of Trust, Leases and Rents and Loan documents.

### Transfer of the Loan to the Trust

54.    In or about June 1999, PaineWebber Mortgage Acceptance Corporation V agreed to purchase certain loans Paine Webber originated that conformed to certain criteria specified in the Mortgage Loan Purchase Agreement.  Effective as of June 1, 1999, Paine Webber transferred the Loan to PaineWebber Mortgage Acceptance Corporation V pursuant to the Mortgage Loan Purchase Agreement.

55.    The same day and pursuant to the Pooling and Servicing Agreement, PaineWebber Mortgage, as Depositor, transferred the Loan to LaSalle Bank, N.A. as Trustee for the Certificateholders of the Trust.

### The Failed Loan

## Lack of Public Utilities at the Peace Arch Factory Outlet

56.     The property used to secure Gateway's Mortgage is property located in Whatcom County, Washington, and is known as the Peace Arch Factory Outlet Center – Phase I ("the Property"), which is where Gateway operates a factory outlet center by leasing space to retail tenants.

57.     The Property has never been serviced with public water and sewer utility services. The Property is serviced by a private septic system and a private water well, which is over a mile from the Property and not owned by Gateway.

58.     Furthermore, Gateway currently has no legal right to enter upon these private lands and public rights-of-way for purposes of making necessary repairs to the water pipes. As a result, Gateway would bear the full cost of removing and relocating the waterlines if mandated by the County to accommodate road widening or other improvements.

59.     On September 9, 1992, Gateway's principal executed a Declaration of Restrictions and Grant of Easements for Water System (the "Declaration"). The Declaration refers to Gateway being able to draw water from a well located on the property. While such a well exists, it has always been dry, capped, and nonfunctioning. However, the existence of this well as a functioning source of water was relied upon in the Property survey, title report, appraisal, and environmental reports issued by Ward Cook's consultants in connection with closing the loan.

60.     Ward Cook and Paine Webber had every opportunity to inspect the Property and determine that a functioning well did not exist. Furthermore, Gateway made Ward Cook and Paine Webber fully aware of the erroneous claim that a functioning well existed on

the Property. Despite this knowledge, the documentation prepared in conjunction with the loan continued to reference the existence of a functioning well on the Property.

61.     These events ran contrary to Paine Webber's, PaineWebber Inc.'s, and PaineWebber Mortgage's representations and/or constituted omissions of material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading. The following misrepresentations and omissions were made by Paine Webber in the Mortgage Loan Purchase Agreement and adopted by PaineWebber Inc. and PaineWebber Mortgage in the COM, Prospectus, and Prospectus Supplement. Specifically:

a.     PaineWebber Inc., PaineWebber Mortgage, and Paine Webber represented that no covenants, conditions and restrictions, rights of way, easements or other matters of public record, individually or in the aggregate, materially interfered with the use of the Property or the security intended to be provided by Gateway or with the Gateway's ability to pay its obligations when they become due or the value of the Property.

b.     PaineWebber Inc., PaineWebber Mortgage, and Paine Webber represented that the terms of the loan documents complied in all material respects with all requirements of applicable local, state or federal law.

c.     PaineWebber Inc., PaineWebber Mortgage, and Paine Webber represented that based upon a site inspection conducted in connection with the origination of the Loan and a review of the related engineering report, the Property is free and clear of any material damage that would affect materially and adversely the value of the Property as security for the Loan.

PLAINTIFF'S AMENDED COMPLAINT – page 39

d. PaineWebber Inc., PaineWebber Mortgage, and Paine Webber represented that the improvements located on or forming part of the Property complied with applicable zoning and building laws, ordinances and regulations, or if such improvement did not so comply, such non-compliance did not materially and adversely affect the value of the Property.

e. PaineWebber Inc., PaineWebber Mortgage, and Paine Webber represented that the appraisal and appraiser both satisfied the requirements of the Uniform Standard of Professional Appraisal Practice as adopted by the Appraisal Standards Board of the Appraisal Foundation, all as in effect on the date the Loan was originated.

62. Paine Webber not only failed to disclose material facts about the Property, but sought to cover them up by making representations and warranties in the MLPA that:

a. "(A) Neither the Mortgage Loan Seller, nor, to the Mortgage Loan Seller's best knowledge, (1) any originator other than the Mortgage Loan Seller or (2) the Mortgagor, committed any fraudulent acts during the orientation process of any Mortgage Loan, … and (C) to the best of the Mortgage Loan Seller's knowledge, (1) the origination of each Mortgage Loan purchased by the Mortgage Loan Seller and (2) the servicing and collection of each Mortgage Loan is in all material respects legal, proper and prudent in accordance with customary industry standards utilized by prudent institutional and commercial mortgage lenders or loan servicers as appropriate." See MLPA 3.2(b)(iii);

b. "There is no material default, breach, violation or event of acceleration existing under the related Mortgage or Mortgage Note, and to the Mortgage Loan Seller's

knowledge, there is no event ... which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute such a default, breach, violation or event of acceleration." See MLPA 3.2(b)(vi);

63. The facts PaineWebber Inc., PaineWebber Mortgage, and Paine Webber misrepresented and/or omitted were material in that: (1) they demonstrated the Borrower's financial instability and eventual inability to make payments on the Loan and otherwise comply with the terms of the Deed of Trust; (2) as a result the Deed of Trust eventually went unpaid and was subject to default; and (3) the Property securing the Deed of Trust was overvalued, or jeopardized and devalued.

### The Property's Pre-Existing Conditions and Unstable Economics

64. During the loan origination process, and immediately thereafter, pre-existing conditions and events well-known to Ward Cook and Paine Webber indicated that the Property could not produce income sufficient to timely pay off the mortgage. These pre-existing conditions and events included: (a) the potential costs to the Property of not having all private easements and a permanent, irrevocable easement with the County right-of-way for the private water transmission lines, (b) the impact of declining tenant sales (based largely on the significant deterioration of the Canadian currency), (c) the impact of month-to-month leases or leases with maturities of less than 18 months, (d) the impact of rental rate discounting to allow for concessions, tenant improvements and tenant expense caps, and (e) media (national and local) reports on the poor performance of outlet centers, which posed a higher risk profile.

65. These conditions and events did not occur overnight, but instead were either pre-existing or resulted from prolonged economic forces pre-dating the June 1999 COM, Prospectus,

and Prospectus Supplement.  These conditions would have been discovered through properly conducted underwriting in connection with the origination of the Mortgage Loan.  Despite these pre-existing conditions and events, Paine Webber warranted and represented that:

a.      "The Mortgage Loan Seller has not withheld any material information with respect to the Mortgage File;"  See MLPA 3.2(a)(v);

b.      "The Mortgage Loan Seller has no knowledge that the material representations and warranties made by the Mortgagor in each Mortgage Loan are not true in any material respect."  See MLPA 3.2(b)(ii);

c.      "With respect to each Mortgage Loan originated by a correspondent of the [Paine Webber] and purchased or 'table funded' by [Paine Webber] in connection with a correspondent relationship with such originator … (A) such Mortgage Loan was underwritten substantially in accordance with standards established by [Paine Webber], (which standards are in all material respects the same as the underwriting standards for Mortgage Loans originated by [Paine Webber]); … (C) the closing documents (which include assignment documents executed by the Mortgage Loan originator in favor of [Paine Webber]) for the Mortgage Loan were prepared in substantial compliance with forms approved by [Paine Webber] as the successor and assign to the Mortgage Loan originator."  See MLPA 3.2(b)(lvi); and

d.      Each Mortgage Loan originated by [Paine Webber] was underwritten consistent in all material respects with the standards of [Paine Webber] as then in effect and each Mortgage Loan purchased by [Paine Webber] from a third-party originator

was underwritten consistent in all material respects with prudent commercial mortgage conduit lending standards." See MLPA 3.2(b)(lvii).

66. Paine Webber, PaineWebber Inc., and PaineWebber Mortgage failed to disclose the correct facts in the COM, Prospectus, or Prospectus Supplement.

67. The facts PaineWebber Inc., PaineWebber Mortgage, and Paine Webber misrepresented and/or omitted were material in that: (1) they demonstrated the Borrower's financial instability and eventual inability to make payments on the Loan and otherwise comply with the terms of the Deed of Trust; (2) as a result the Deed of Trust eventually went unpaid and was subject to default; and (3) the Property securing the Deed of Trust was overvalued, jeopardized, and devalued.

## PAINE WEBBER'S LOAN TO P & D INVESTMENTS, INC.

### The Loan Underwriting

68. P & D Investments, Inc. ("P & D" or the "Borrower") is a North Carolina corporation with its registered office in Charlotte, North Carolina.

69. On or about July 7, 1998, Paine Webber made a loan in the original principal amount of $1,600,000 (the "Loan") to P & D. As evidence of the indebtedness resulting from the Loan, P & D made, executed and delivered to Paine Webber a Mortgage Note (the "Note") in the original principal amount of $1,600,000.

70. The Loan was secured by, *inter alia*, a Deed of Trust, Security Agreement and Assignment of Leases and Rents (the "Deed of Trust" or "Mortgage"), dated as of July 7, 1998.

### Transfer of the Loan to the Trust

71. In or about June 1999, PaineWebber Mortgage agreed to purchase certain loans Paine Webber originated that conformed to certain criteria specified in the Mortgage Loan Purchase Agreement. Effective as of June 1, 1999, Paine Webber transferred the Loan to PaineWebber Mortgage pursuant to the Mortgage Loan Purchase Agreement.

72. The same day and pursuant to the Pooling and Servicing Agreement, PaineWebber Mortgage, as Depositor, transferred the Loan to LaSalle Bank, N.A. as Trustee for the Certificateholders of the Trust.

## The Failed Loan

### Villager Lodge: the "Haven of Illegal Activity"

73. The property securing P & D's Mortgage is located in Mecklenburg County, North Carolina known as the Villager Lodge ("the Property"), which is where P & D operates a 110-resident motel by renting rooms on a daily and weekly basis.

74. Beginning as early as January 1997, the Property was subject to repeated breaches of the peace including:

    a. The Charlotte-Mecklenburg Police Department (the "Police") receiving a total of 1,328 calls to the property from January 1997 to April 2000;

    b. Police officers taking 1,204 miscellaneous reports for incidents that occurred at the property from January 1997 to April 2000;

    c. From January 1997 to March 2000, Police officers taking 186 offense reports that included, but were not limited to, homicide, armed robbery, robbery, assault, and numerous property crimes;

    d. From January 1997 to March 2000, Police officers making 204 arrests for incidents that included, but were not limited to, homicide, armed robbery,

aggravated assault, weapons violations, controlled substance violations, prostitution, and sex offenses;

e.   Medic personnel responding to 192 calls for service for incidents including gunshot wounds, lacerations from assaults, drug overdoses, and psychiatric/suicide attempts from September 1997 to February 2000.

75.   Over this same time period, the Property acquired a reputation in both the law enforcement community and the City of Charlotte in general as a marketplace for the illegal sale and possession of controlled substances and as a haven for criminal activity associated with the illegal sale and possession of controlled substances. In addition, prior to April 2000, P & D received written notice from the City of Charlotte that a nuisance was being maintained on the Property based on at least two prior occurrences within a five year period that involved the possession of a controlled substance with the intent to sell or the sale of controlled substances.

76.   The culmination of these illegal activities prompted the City of Charlotte to file a complaint against Paine Webber and P & D in June 2000 alleging violations of North Carolina's nuisance statute and seeking a forfeiture of the Property.

77.   These events ran contrary to Paine Webber's, PaineWebber Inc.'s, and PaineWebber Mortgage's representations and/or constituted omissions of material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading. The following misrepresentations and omissions were made by Paine Webber in the Mortgage Loan Purchase Agreement and adopted by PaineWebber Inc. and PaineWebber Mortgage in the COM, Prospectus, and Prospectus Supplement. Specifically:

a.  Paine Webber, PaineWebber Inc., and PaineWebber Mortgage represented that there was no event which with the passage of time or with notice and the expiration of any grace or cure period, would constitute a material default, breach, violation or event of acceleration.

b.  Paine Webber, PaineWebber Inc., and PaineWebber Mortgage represented that, as of the Closing Date, there was no pending action, suit or proceeding, arbitration or governmental investigation against P & D or the Property, an adverse outcome of which would materially and adversely affect such P & D's ability to perform under the Loan.

c.  Paine Webber, PaineWebber Inc., and PaineWebber Mortgage represented that, based upon site inspection conducted in connection with the origination of the Loan and a review of the related engineering report, the Property was free and clear of any material damage that would affect materially and adversely the value of such the Property as security for the Loan.

d.  Paine Webber, PaineWebber Inc., and PaineWebber Mortgage represented that the improvements located on or forming part of the Property complied with applicable zoning and building laws, ordinances and regulations, or if any such improvement did not so comply, such non-compliance did not materially and adversely affect the value of the Property.

78.  Furthermore, Paine Webber not only failed to disclose material facts about the Property, but sought to cover them up by making representations and warranties in the Mortgage Loan Purchase Agreement that:

PLAINTIFF'S AMENDED COMPLAINT – page 46

a.   "The Mortgage Loan Seller has not withheld any material information with respect to the Mortgage File;" *See* MLPA 3.2(a)(v);

b.   "The Mortgage Loan Seller has no knowledge that the material representations and warranties made by the Mortgagor in each Mortgage Loan are not true in any material respect." *See* MLPA 3.2(b)(ii);

c.   "The terms of each of the Mortgage Loan Documents comply in all material respects with all requirements of applicable local, state or federal law." *See* MLPA 3.2(b)(xxvi); and

d.   "Each Mortgage Loan originated by [Paine Webber] was underwritten consistent in all material respects with the standards of [Paine Webber] as then in effect and each Mortgage Loan purchased by [Paine Webber] from a third-party originator was underwritten consistent in all material respects with prudent commercial mortgage conduit lending standards." *See* MLPA 3.2(b)(lvii).

79.   The facts Paine Webber, PaineWebber Inc., and PaineWebber Mortgage misrepresented and/or omitted were material in that: (1) they demonstrated the Borrower's financial instability and eventual inability to make payments on the Loan and otherwise comply with the terms of the Deed of Trust; (2) as a result the Deed of Trust eventually went unpaid and was subject to default; and (3) the Property securing the Deed of Trust was jeopardized and devalued.

### The Property's Deteriorating Condition

80.   Moreover, financial reports and loan files for the Property indicate that almost all of the revenue collected at the Property was in the form of cash. A proper site inspection by

Paine Webber would have revealed the alarming rate of crime at the Property and the high-risk nature of the pure cash based revenue.

81.     Once the City of Charlotte intervened and disallowed criminals, prostitutes, and drug addicts/dealers from being guests, the occupancy rates at the Property dropped considerably causing the Loan to enter into monetary default.

82.     In addition, during the loan origination process Paine Webber identified that the Property was located in a "blighted area" and contained several deferred maintenance issues that needed to be addressed immediately because the Property had not undergone any significant rehabilitation or renovation since it was built in 1958.

83.     However, records indicate that instead of making immediate and necessary maintenance Paine Webber demanded that the inspecting engineer revise the estimates for the deferred maintenance reserve by roughly $90,000.00.

84.     Paine Webber's demand for a revised appraisal ran contrary to Paine Webber's representation that: "[T]he appraisal and appraiser both satisfy the requirements of the 'Uniform Standard of Professional Appraisal Practice' as adopted by the Appraisal Standards Board of the Appraisal Foundation, all as in effect on the date the Mortgage Loan was originated. *See* MLPA 3.2(b)(l).

85.     Furthermore, Paine Webber not only failed to disclose material facts about the Property, but sought to cover them up by making representations and warranties in the Mortgage Loan Purchase Agreement that:

        a.      "The Mortgage Loan Seller has not withheld any material information with respect to the Mortgage File;" *See* MLPA 3.2(a)(v);

PLAINTIFF'S AMENDED COMPLAINT – page 48

b. "The Mortgage Loan Seller has no knowledge that the material representations and warranties made by the Mortgagor in each Mortgage Loan are not true in any material respect." *See* MLPA 3.2(b)(ii);

c. "The terms of each of the Mortgage Loan Documents comply in all material respects with all requirements of applicable local, state or federal law." *See* MLPA 3.2(b)(xxvi); and

d. "Each Mortgage Loan originated by [Paine Webber] was underwritten consistent in all material respects with the standards of [Paine Webber] as then in effect and each Mortgage Loan purchased by [Paine Webber] from a third-party originator was underwritten consistent in all material respects with prudent commercial mortgage conduit lending standards." *See* MLPA 3.2(b)(lvii).

86. Paine Webber, PaineWebber Inc., and PaineWebber Mortgage failed to disclose the correct facts in the COM, Prospectus, or Prospectus Supplement.

87. The facts Paine Webber, PaineWebber Inc., and PaineWebber Mortgage misrepresented and/or omitted were material in that: (1) they demonstrated the Borrower's financial instability and eventual inability to make payments on the Loan and otherwise comply with the terms of the Deed of Trust; (2) as a result the Deed of Trust eventually went unpaid and was subject to default; and (3) the Property securing the Deed of Trust was jeopardized and devalued.

## PLAINTIFF'S CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Exchange Act § 10(b) (15 U.S.C. § 78j) and Rule 10b-5 (17 C.F.R. § 240.10b-5)

88. Plaintiff incorporates by reference the Amended Complaint's preceding paragraphs.

89. Defendants used an instrumentality of interstate commerce in connection with the dissemination of the false statements specified above or approved such false statements knowing that they would be disseminated to the public and purchasers of Certificates. Defendants knew or recklessly disregarded that the false statements specified above were misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90. Paine Webber in the MLPA and PaineWebber Inc. in the COM, Prospectus, and Prospectus Supplement violated section 10(b) of the 1934 Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Certificates during the Class Period. Specifically, the Prospectus and the Prospectus Supplement misrepresented those items set forth in this Amended Complaint under the headings "The Misrepresentations in Offering Materials" and "Misrepresentations in the Mortgage Loan Purchase Agreement Incorporated into the Offering Materials." The specific loan transactions detailed in this Amended Complaint provide specific examples of the falsity of those representations and the materiality of the

PLAINTIFF'S AMENDED COMPLAINT – page 50

facts misrepresented or omitted. Furthermore, Defendants failed to state that Paine Webber's representations and warranties were knowingly false, in that Paine Webber sold the Trust a loan pool containing loans that it knew did not meet the representations and warranties, or that Paine Webber had a pattern and practice of failing to follow the very underwriting guidelines that it warranted it had followed as to individual loans.

91.     Thus, Defendants made the misrepresentations and omissions knowingly, or with reckless disregard for their truth or falsity.

92.     Plaintiff and the Certificateholders justifiably relied on Defendants' misrepresentations and omissions. Indeed, the only tool available for evaluating the loan pool is the representations and warranties and the other information set forth in the Prospectus and Prospectus Supplement. Plaintiff and the Certificateholders would not have purchased their certificates had they known that Defendants lied about the quality of the loans in the pool, and placed loans in the pool that Defendants knew did not meet the representations and warranties and failed to disclose their pattern and practice of failing to follow proper underwriting guidelines.

93.     The issuance and pricing of the Certificates depended upon the representations by the Depositor of the loans that they were of a particular quality. To the extent that the COM, Prospectus, and Prospectus Supplement misrepresented the quality of a material loan or loans or contained material omissions, such misrepresentations or omissions affected the overall pool of loans and the attendant artificially inflated pricing of the Certificates and, in fact, without the misrepresentations and omissions made by Defendants the defective loans would not have been included in the pool, thus resulting in a lower price for the Certificates. Alternatively, without the misrepresentations and omissions, the Trust

PLAINTIFF'S AMENDED COMPLAINT – page 51

would never have been formed and there would never have been any issuance of the Certificates. Thus, all purchasers of Certificates suffered a similar injury through their purchase of Certificates at artificially inflated prices due to Defendants' misrepresentations and omissions, and a presumption of reliance applies.

94. Additionally, the improperly underwritten loans in the pool have resulted in decreased cash flow and increased costs that have resulted in ORIX and other Class Members suffering a loss in the stream of income they purchased via the Certificates. Such reduced income has caused the value of the Certificates to decline, thus damaging the Class.

95. As a direct and proximate result of such wrongful conduct, the Plaintiff and other members of the Class were damaged in connection with their purchase of Certificates during the Class Period by paying artificially and falsely inflated prices for the Certificates. Plaintiff, the Trust, and the other Certificateholders suffered damage as a direct and proximate result of Defendants' wrongful conduct in that the Trust and Certificateholders have experienced a decline in payments and increased costs.

96. By reason of the foregoing, the Defendants violated Exchange Act § 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated pursuant thereto, and are accordingly liable.

## SECOND CAUSE OF ACTION
### Violation of Exchange Act § 20(a) (15 U.S.C. § 78t)

97. Plaintiff incorporates by reference the Amended Complaint's preceding paragraphs.

98. PaineWebber Inc., Paine Webber, and PaineWebber Mortgage were all affiliates that had the specific purpose of carrying out this and similar transactions. They each shared information and employees with the others. Furthermore, an officer of PaineWebber Inc. and PaineWebber Mortgage signed the Mortgage Loan Purchase Agreement on behalf of

PLAINTIFF'S AMENDED COMPLAINT – page 52

Paine Webber. PaineWebber Inc. and PaineWebber Mortgage received and publicized through the COM, Prospectus, and Prospectus Supplement, information they knew or should have known to be false, specifically: the representations and warranties, information regarding Paine Webber's loan origination, underwriting, and servicing, and information regarding the Paine Webber-originated, underwritten, and serviced loan pool.

99.     PaineWebber Inc., by virtue of its position, participated in and exercised control over Paine Webber and PaineWebber Mortgage. PaineWebber Inc.'s officers sat as officers in PaineWebber Mortgage and Paine Webber. As such, PaineWebber Inc. had the power and ability to control and direct the acts and conduct complained of in this Amended Complaint and PaineWebber Inc. was aware of the omissions and misrepresentations in the COM, Prospectus, and Prospectus Supplement. At all relevant times, PaineWebber Inc. had the power and influence to control Paine Webber and PaineWebber Mortgage. Indeed, an officer of PaineWebber Inc. signed the Mortgage Loan Purchase Agreement on behalf of both PaineWebber Mortgage as purchaser and Paine Webber as seller. Thus, PaineWebber Inc. directly and/or indirectly controlled Paine Webber and PaineWebber Mortgage, who are each liable under section 10(b) and Rule 10b-5 of the 1934 Act.

100.    PaineWebber Mortgage, by virtue of its position, participated in and exercised control over Paine Webber and PaineWebber Inc. PaineWebber Mortgage's officers sat as officers in PaineWebber Inc. and Paine Webber. As such, PaineWebber Mortgage had the power and ability to control and direct the acts and conduct complained of in this Amended Complaint and PaineWebber Mortgage was aware of the omissions and misrepresentations in the COM, Prospectus, and Prospectus Supplement. At all relevant times, PaineWebber Mortgage had the power and influence to control Paine Webber and

PaineWebber Inc. Indeed, an officer of PaineWebber Mortgage signed the Mortgage Loan Purchase Agreement on behalf of both PaineWebber Mortgage as purchaser and Paine Webber as seller. Thus, PaineWebber Mortgage directly and/or indirectly controlled Paine Webber and PaineWebber Inc., who are each liable under section 10(b) and Rule 10b-5 of the 1934 Act.

101. Paine Webber, by virtue of its position, participated in and exercised control over PaineWebber Mortgage and PaineWebber Inc. Paine Webber's officers sat as officers in PaineWebber Inc. and PaineWebber Mortgage. As such, Paine Webber had the power and ability to control and direct the acts and conduct complained of in this Amended Complaint and Paine Webber was aware of the omissions and misrepresentations in the COM, Prospectus, and Prospectus Supplement. At all relevant times, Paine Webber had the power and influence to control PaineWebber Mortgage and PaineWebber Inc. Furthermore, Paine Webber knew of its origination, underwriting, and servicing practices and the quality of the loans it sold to PaineWebber Mortgage. PaineWebber Mortgage and PaineWebber Inc. repeated in the COM, Prospectus, and Prospectus Supplement the information Paine Webber supplied regarding Paine Webber's origination, underwriting, and servicing practices and the information Paine Webber supplied regarding the quality of the loans Paine Webber sold to PaineWebber Mortgage. Thus, Paine Webber directly and/or indirectly controlled PaineWebber Mortgage and PaineWebber Inc., who are each liable under section 10(b) and Rule 10b-5 of the 1934 Act.

102. PaineWebber Mortgage, PaineWebber Inc., and Paine Webber, as control persons pursuant to Section 20(a) of the 1934 Act, further are jointly and severally liable with

PaineWebber Mortgage to the Plaintiff and other Class Members for violation of the 1934 Act to the full extent.

103. As a result, Plaintiff and other Class Members are entitled to recover from said Defendants, including Defendant UBS Warburg to the extent it succeeded to the liability any Defendants, the full amount for all damages to be established at trial.

### THIRD CAUSE OF ACTION
### Violation of Securities Act § 12(a)(2) (15 U.S.C. § 77*l*)

104. Plaintiff incorporates by reference the Amended Complaint's preceding paragraphs.

105. Paine Webber, PaineWebber Mortgage, and PaineWebber Inc. offered or sold the certificates via interstate delivery services and United States mail. PaineWebber, Inc. sold the Certificates, by means of the false and misleading Prospectus and Prospectus Supplement. Paine Webber, PaineWebber Mortgage, and PaineWebber, Inc. are "sellers" within the meaning of the Securities Act because they (i) transferred title to members of the Class; (ii) transferred title to the Certificates to other underwriters and/or broker/dealers that sold the Certificates as agents for PaineWebber, Inc.; or (iii) solicited the purchase of the Certificates by the Class Members, motivated at least in part by their own financial interests. Such solicitation included participation in the preparation of the false and misleading Offering Documents.

106. Plaintiff and the Class Members purchased the Certificates pursuant to the Offering Documents.

107. Plaintiff and the Class Members did not know all of the materially false and misleading statements and material omissions in the Offering Documents, and in the exercise of reasonable care could not have known about them.

Certificates from Paine Webber, Inc. for actual damages or rescission and the return of the purchase price of the Certificates. To the extent UBS Warburg succeeded to the liability of PaineWebber, Inc., it is liable to Plaintiff and all Class Members.

## FOURTH CAUSE OF ACTION
### Securities Act § 11 (15 U.S.C. § 77k)

112. Plaintiff incorporates by reference the Amended Complaint's preceding paragraphs.

113. PaineWebber Inc. was an underwriter with respect to the Certificates.

114. The registration statement, filed with the Securities and Exchange Commission on September 29, 1998, incorporated the Prospectus and Prospectus Supplement. As set forth with particularity above, the Prospectus and Prospectus Supplement contained untrue statements of material facts or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. ORIX brings this claim on behalf of those Certificateholders who purchased Certificates offered under the registration statement identified below.

115. Paine Webber is name in the registration statement as having prepared or certified parts of same, or as having prepared or certified a report or valuation that was used in connection with same, which statements, reports, or valuations contained misrepresentations and omissions as set forth above.

116. As a direct and proximate result of PaineWebber Inc.'s wrongful conduct, the Plaintiff and other members of the Class were damaged in connection with their purchase of Certificates during the Class Period.

117. By reason of the foregoing, PaineWebber Inc. violated Securities Act § 11, 15 U.S.C. § 77k, and is accordingly liable to Plaintiff and all Class Members who purchased

108. The Prospectus and Prospectus Supplement included untrue statements of material fact, or omitted to state facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading. Specifically, the Prospectus and the Prospectus Supplement misrepresented those items set forth in this Amended Complaint under the headings "The Misrepresentations in Offering Materials" and "Misrepresentations in the Mortgage Loan Purchase Agreement Incorporated into the Offering Materials." The specific loan transactions detailed in this Complaint provide specific examples of the falsity of those representations and their materiality.

109. Although Plaintiff and other Class Members received the COM in connection with their purchase of the Certificates, the Prospectus and Prospectus Supplement accompanied the COM, and the COM states that "[p]urchasers should examine all information set forth in this memorandum, including the prospectus supplement and the prospectus, copies of which are attached hereto as Exhibit B." *See* COM at 2. Furthermore, the COM notes that "[i]n the case of any discrepancy between this Memorandum or the Prospectus Supplement…the Prospectus Supplement…shall govern," indicating that the latter was the actual operative offering document. *See* COM at 2. Thus, Defendants marketed and sold to prospective investors the Certificates as part of a coordinated integrated "public" offering of securities for purposes of Section 12 of the Securities Act.

110. As a direct and proximate result of Defendant's wrongful conduct in violation of section 12(a)(2), the Plaintiff and other Class Members were damaged in connection with their purchase of Certificates during the Class Period.

111. By reason of the foregoing, PaineWebber Inc. violated Securities Act § 12(a)(2), 15 U.S.C. § 77*l*, and is accordingly liable to Plaintiff and all Class Members who purchased

Certificates from PaineWebber Inc. To the extent UBS Warburg succeeded to the liability of PaineWebber, Inc., it is liable to Plaintiff and all Class Members.

### FIFTH CAUSE OF ACTION
#### Securities Act § 15 (15 U.S.C. § 77*o*)

118. Plaintiff incorporates by reference the Amended Complaint's preceding paragraphs.

119. As set forth above, Paine Webber, PaineWebber, Inc., PaineWebber Mortgage and Merrill Lynch committed underlying primary violations of the Securities Act.

120. Paine Webber, PaineWebber, Inc., and PaineWebber Mortgage controlled Merrill Lynch by actually participating in Merrill Lynch's operations, specifically Merrill Lynch's preparation of the COM, Prospectus, and Prospectus Supplement, and the marketing and sale of the Certificates. Paine Webber, PaineWebber, Inc. and PaineWebber Mortgage possessed the power to control the specific transaction upon which Merrill Lynch's violation is predicated by having exclusive access to the following information, which is set forth with specificity above: the representations and warranties contained in the Mortgage Loan Purchase Agreement, information regarding Paine Webber's loan origination, underwriting, and servicing, and information regarding the Paine Webber-originated, underwritten, and serviced loan pool. Paine Webber, PaineWebber, Inc., and PaineWebber Mortgage, by virtue of their positions, participated in and exercised control over Merrill Lynch and had the power and ability to control and direct the acts and conduct complained of in this Amended Complaint and were aware of the omissions and misrepresentations in the COM, Prospectus, and Prospectus Supplement. At all relevant times, Paine Webber, PaineWebber, Inc., and PaineWebber Mortgage had the power and influence to control Merrill Lynch. By failing to take this action to correct the conduct and misstatements of Merrill Lynch, Defendants Paine Webber, PaineWebber, Inc., and

PaineWebber Mortgage assisted and participated in the fraud complained of in this Amended Complaint.

121.  Similarly, by virtue of providing information for the COM, Prospectus, and Prospectus Supplement that was uniquely in its control, Paine Webber influenced and controlled the conduct of PaineWebber Inc., PaineWebber Mortgage, and Merrill Lynch. Specifically, Paine Webber provided PaineWebber Inc., PaineWebber Mortgage, and Merrill Lynch the following information, which is set forth with specificity above: the representations and warranties, information regarding Paine Webber's loan origination, underwriting, and servicing, and information regarding the Paine Webber-originated, underwritten, and serviced loan pool. Paine Webber by virtue of its position, participated in and exercised control over PaineWebber Inc., PaineWebber Mortgage, and Merrill Lynch and had the power and ability to control and direct the acts and conduct complained of in this Amended Complaint and was aware of the omissions and misrepresentations in the COM, Prospectus, and Prospectus Supplement. At all relevant times, Paine Webber had the power and influence to control PaineWebber Inc., PaineWebber Mortgage, and Merrill Lynch. By failing to take this action to correct the conduct and misstatements of PaineWebber Inc., PaineWebber Mortgage, and Merrill Lynch, Paine Webber assisted and participated in the fraud complained of in this Amended Complaint.

122.  Defendants, as control persons pursuant to Section 15 of the 1933 Act, further are jointly and severally liable to the Plaintiff and other Class Members for violation of the 1933 Act to the full extent.

123.  As a result, Plaintiff and other Class Members are entitled to recover from Defendants the full amount for all damages to be established at trial.

## REQUEST FOR RELIEF

Wherefore, Plaintiff prays that Defendants be cited to appear and answer, and that Plaintiff, upon hearing, have judgment against Defendants as follows:

1.  For rescission of Plaintiff's and other Class Members' investment in the Certificates or, alternatively, for actual damages at least in the amount of $616,668,000.

2.  For Plaintiff's reasonable attorneys' fees and costs from this action.

3.  For all interest as determined by applicable law.

4.  For all costs of Court and suit.

5.  For any other relief to which Plaintiff is entitled.

PLAINTIFF DEMANDS A TRIAL BY JURY.

Dated: December 13, 2002.

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD, LLP

By: _____

R. Laurence Macon
Texas State Bar No. 12787500
Mary L. O'Connor
Texas State Bar No. 15186900
Talcott J. Franklin
Texas State Bar No. 24010629
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone (214) 969-2800
Facsimile  (214) 969-4343

Attorneys for the Plaintiff:

ORIX CAPITAL MARKETS, L.L.C.

627422

PLAINTIFF'S AMENDED COMPLAINT – page 60

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of December, 2002, a true and correct copy of the foregoing was served by hand delivery and First Class Mail on the following counsel of record for defendants:

Scott L. Davis
Gardere Wynne Sewell LLP
3000 Thanksgiving Tower
1601 Elm Street
Dallas, TX 75201

A.B. Conant, Jr.
Conant French & Chaney, LLP
3880 Bank One Center
1717 Main Street
Dallas, TX 75201

and by facsimile and certified mail, return receipt requested to:

George Wailand
Cahill Gordon & Reindel
Eighty Pine Street
New York, NY 10005

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

ORIX Capital Markets, L.L.C. ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

### PURCHASES

| Security | | Transaction | Date | Price | Par Amount Purchased |
|---|---|---|---|---|---|
| PMAC 1999-C1 | Class E | Buy | 06/07/99 | 90.09375 | 8,809,000.00 |
| PMAC 1999-C1 | Class F | Buy | 06/07/99 | 67.87500 | 11,858,000.00 |
| PMAC 1999-C1 | Class F | Buy | 06/07/99 | 68.46094 | 23,380,000.00 |
| PMAC 1999-C1 | Class G | Buy | 06/07/99 | 52.35938 | 24,666,000.00 |
| PMAC 1999-C1 | Class H | Buy | 06/07/99 | 38.66709 | 7,400,000.00 |
| PMAC 1999-C1 | Class I | Buy | 06/07/99 | 26.68156 | 11,983,602.00 |
| PMAC 1999-C1 | Class E | Buy | 12/07/00 | 66.63000 | 5,845,000.00 |
| PMAC 1999-C1 | Class E | Buy | 12/07/00 | 62.78250 | 2,964,000.00 |

### SALES

| Security | | Transaction | Date | Price | Par Amount Sold |
|---|---|---|---|---|---|
| PMAC 1999-C1 | Class E | Sell | 12/8/2000 | 92.50000 | 17,618,000.00 |

5.    During the three years prior to the date of this Certificate, Plaintiff has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws:    **None**

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this thirteenth day of December, 2002.

ORIX CAPITAL MARKETS, L.L.C.
by Michael F. Wurst
Director, Distressed and Proprietary Assets,
Real Estate Group